GEORGE E. NORWOOD V. BANK OF COMMERCE OF LINCOLN, NEBRASKA.

FILED OCTOBER 4, 1906.   No. 14,351.

1. **Note: BONA FIDE PURCHASER.** To defeat a recovery on a promissory note in the hands of an indorsee, who takes it before maturity for a valuable consideration, in the ordinary course of business, without notice, it is not sufficient to show that it was taken under circumstances which might excite suspicion in the mind of a prudent man, but it must be shown that the indorsee took the paper under circumstances showing bad faith or want of honesty on his part. *Dobbins v. Oberman,* 17 Neb. 163, followed and approved.

2. **Evidence** examined, and *held* not sufficient to show bad faith or want of honesty in the purchase of the note in controversy.

ERROR to the district court for Nuckolls county: LESLIE G. HURD, JUDGE. *Affirmed.*

*Cole & Brown,* for plaintiff in error.

*S. L. Geisthardt* and *W. F. Buck, contra.*

OLDHAM, C.

This action was begun in the district court for Nuckolls county, Nebraska, to recover the amount alleged to be due upon a certain promissory note, executed by the defendant and payable to the Leader Fence Machine Manufacturing Company, and alleged to have been indorsed for a valuable consideration to the plaintiff before maturity. Defendant, for answer to plaintiff's petition, admitted the execution of the note, and denied that the note was purchased for value, and without notice, by the

plaintiff before its maturity. The answer further alleged, in substance, that the note was given without consideration; that defendant was induced to sign the note by the representations of the agent of the fence company that the note would not be negotiated, and that it would be simply held as security for such machines as defendant would sell for the company for a period of six months; that it was agreed at the time of the execution of the note that defendant was to act as the agent of the fence company and sell its machines in a certain portion of Nuckolls county; that the machine company agreed to furnish machines to the defendant for sale at the price of $6 apiece, with the freight prepaid, and to send a man to aid the defendant in the sale of the machines; and that the machines were represented to be first class in every particular, and that they would build and construct in an easy and practical manner any sort of a wire fence, and that they would sell readily, and that the company would furnish wire to him for building fences at two and one-half cents a pound; that defendant relied on all these representations when he signed the note, and that all such representations were false; that it was further represented that, if defendant did not sell any machines within six months, the company would return his note and take back the machines delivered to his order. It was further alleged that defendant had offered to return all machines and all property delivered to him by the company and had kept his tender good. There is no allegation in the answer that the maker of the note and the indorser thereof were solvent and known to be solvent at the time of the purchase of the note. Plaintiff filed a reply in the nature of a general denial of the new matter set up in the answer, and alleging the purchase in good faith, without notice in the ordinary course of business. On issues thus joined there was a trial to the court and jury, and at the close of the testimony the court directed a verdict for the plaintiff, and entered judgment on the verdict. To reverse this judgment defendant brings error to this court.

At the trial of the cause plaintiff assumed the burden

of proving the *bona fides* of the purchase of the note before
maturity, and for this purpose offered in evidence the
deposition of Morris Weil, president of the plaintiff bank,
whose testimony on the material issues is as follows: "Q.
I show you here a paper, identified by the reporter as Ex-
hibit 1, purporting to be a promissory note for $100 dated
February 14, 1903, signed G. E. Norwood, and I ask you
who is the holder and owner of this note? A. The Bank of
Commerce. Q. Look at the indorsement there, the words
'Leader Fence Machine Mfg. Co., by J. M. Barber, Mgr.'
I will ask you if you know whose signature that is? A.
Yes. Mr. J. M. Barber. Q. Who is this J. M. Barber?
A. He is the manager of the Leader Fence Machine Man-
ufacturing Company. Q. When did the Bank of Com-
merce purchase that note? * * * With reference to
the maturity, when was it, before or after? A. Long
before. Q. What consideration, if any, did the Bank of
Commerce give for it, cash or what? A. Cash. Q. In
what way did the Bank of Commerce get it with reference
to its being in the regular course of business? A. Mr.
Barber presented this note with others and we purchased
them of him in the regular course of business. Q. What
knowledge or notice, if any, did you or the bank have of
any defense of any kind to the payment of this note? A.
None whatever. Q. Did you know of any reason of any
kind why the maker should not pay the note? If so, state.
A. None whatever."

Cross-examination: "Q. Do you know where Mr. Barber
came from when he came to sell this note? A. I do not.
Q. Had you seen him before that? A. Yes, sir. Q. Where
and when? A. In the bank, at a previous time. Q. Had
he made some arrangement, or had some conversation with
you relative to the purchase of certain notes that he might
obtain? A. No, sir. Q. Did you have any intimation of
any kind that he would bring certain notes to you to pur-
chase? A. No, sir. Q. What was the nature of his con-
versation with regard to this paper? A. He presented us
a bunch of paper, and asked us on what basis we would

purchase them.  We figured on them, and purchased them.
Q.  Did he tell you, or make you acquainted with the nature
of his business at these times?  A., Yes, sir.  Q.  What busi-
ness did he say he was engaged in?  A.  Manufacturing
machines for making wire fence.  Q.  Did you know any-
thing of this company at the time that he came there?  A.
Yes, sir.  Q.  Did you inquire into the nature and charac-
ter of the company?  A.  Yes, sir.  Q.  And you knew that
he was the manager?  A., Yes, sir.  Q.  Did you buy the
note from him before you found out the financial respon-
sibility of the maker?  A.  Yes, sir.  Q.  How much did you
pay for the note?  A.  It was bought together with others.
Q.  What others?  A.  There were five different sets of
notes presented at that time for discount.  Q.  How much
did you say you paid for the note?  A.  It was bought with
others and not bought separate.  Q.  Have you any idea
how much you paid for this note?  A.  For the aggregate?
Q.  Yes.  A.  I have.  Q.  How much did the notes aggregate
that you purchased at that time?  A.  I believe $1,900.  Q.
That was the face of the notes?  A.  Yes, sir.  Q.  What
did you pay for them?  A.  $900.  Q.  How did you pay it?
A.  In cash.  Q.  Do you know anything about this man
Barber's financial standing?  A.  Yes, sir.  Q.  What do
you know about him?  A.  His record is good.  Q.  When
you answer that, do you mean with reference to the com-
pany that he acted as manager for, or his own responsi-
bility?  A.  The company and his own responsibility.,  Q.
Both together?  A.  Yes, sir.  Q.  Did you ascertain that
fact before you purchased the notes?  A.  Yes, sir.  Q.  I
believe you answered that you did not make any inquiry
about the maker of this note?  A.  Not before purchasing.
Q.. Did you, of any of those notes that you purchased?
A.  No, sir.  Q.  Did you know anything about their charac-
ter or standing financially?  A.  Only the affidavits that
were attached to those notes.  You might not call it an
affidavit, but a memorandum obtained from one of the offi-
cers, if I am not mistaken, that the makers of these notes
had property in their own names, and were responsible

people." This was all the testimony offered on the *bona fides* of the transfer of the note, which was negotiable in form.

Defendant then took the stand on his own behalf and testified that the note was given to a Mr. Fiefield, who was an agent of the Leader Fence Machine Manufacturing Company, and offered to prove by himself and others that Fiefield, representing the fence machine company, made the representations alleged in the answer to procure defendant's signature to the note; and that the machines, for which the note was given, were an entire failure and did not build fences as represented, were not practical in any way, and were absolutely worthless; and also that the machines were to be sent to Nelson, freight prepaid, which was not done; and that as soon as defendant had discovered the fraud and misrepresentations he offered to return the machines and supplies that he had received from the company. This offer of proof was denied by the court, and, no other testimony being offered, the court directed a verdict for the plaintiff for the amount of the note and interest. In the case of *Violet v. Rose,* 39 Neb. 660, after a careful and painstaking review of the former decisions of this court, the rule was established that, where fraud is alleged in the inception of the note, the burden is on the plaintiff to prove the *bona fides* of the transfer; but, where a want of consideration is relied upon, the burden is on the defendant to show the *mala fides* of the transfer. It is also determined in this case that the order of proof, where failure of consideration is pleaded against an indorsee, rests in the sound discretion of the trial court, that is, that the court may permit testimony tending to show a failure of consideration before evidence tending to impeach the good faith of the indorsement has been offered. Now in the case at bar plaintiff on his own volition introduced evidence, already set out in this opinion, tending to show the good faith of the purchase of the note in suit, and the only evidence offered by defendant touching on this question was such as was elicited from plaintiff's pres-

ident on his cross-examination. This testimony was that the president of the bank had purchased this note with others aggregating $1,900, for the sum of $900; that he knew that the party offering the notes was the general manager of the payee of the note, and that the payee was engaged in the manufacture of fence machines; and that both the general agent and the payee were reported to be solvent. Now, as before stated, there was no allegation in the answer that the maker of the note was solvent, or that the makers of any other of the bunch of notes purchased by plaintiff were solvent. The only thing touching on this question was the answer of plaintiff's witness that certain property statements were attached to the notes. Defendant offered no testimony directly tending to show that any of the makers of the notes purchased by the bank were in fact solvent and known to be so by the plaintiff at the time of the purchase. If all the evidence offered had been admitted, it would have constituted no defense against an indorsee under the law merchant. In *Dobbins v. Oberman,* 17 Neb. 163, it is said that, to defeat a recovery on a promissory note in the hands of an indorsee who takes it before maturity for a valuable consideration, "it is not sufficient to show that he took it under circumstances which ought to excite suspicion in the mind of a prudent man. To have that effect it must be shown that he took the paper under circumstances showing bad faith or want of honesty on his part." This doctrine has been quoted with approval in *Rublee v. Davis,* 33 Neb. 779; *Martin v. Johnston,* 34 Neb. 797, and *First Nat. Bank v. Pennington,* 57 Neb. 404. The only evidence offered, which in any way tends to impeach the good faith of the purchase of the note in suit was the discount which the indorsee received on the whole bunch of notes purchased. These notes, presumably, were for small sums on different persons, residing at considerable distance from the place of business of the indorsee, so that the cost of collection might reasonably have been taken into consideration in estimating the discount on the paper. The note in suit bore no interest

by its terms, and there is no evidence that any of the others differed in this respect.

The question of the solvency of the makers was not placed in issue by the proof offered, so that the only question to determine is whether or not the discount for which the notes were purchased, standing alone, is sufficient to show bad faith in their purchase, while the purchase of negotiable paper on a known solvent maker for a sum materially less than the face of the paper is often referred to by judges and text-writers as a circumstance tending to show bad faith in its purchase; yet, unless the consideration is grossly inadequate, this circumstance alone is not sufficient to establish the *mala fides* of the transfer.

We are therefore of the opinion that the evidence offered was wholly insufficient to show either bad faith or want of consideration in the purchase of the note, and, consequently, it is immaterial whether the evidence offered by defendant tending to show a want of consideration as between the original parties to the note had been admitted or excluded, for in either event an instruction directing a verdict for the plaintiff should have been given. We therefore recommend that the judgment of the district court be affirmed.

AMES and EPPERSON, CC., concur.

By the Court: For the reasons given in the foregoing opinion, the judgment of the district court is

AFFIRMED.